**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| Empower Clinic Services, L.L.C., | |
|      Plaintiff, | |
| v. | Case No. 4:23-cv-4123 |
| Bio Filling Solutions Inc. f/k/a Bio42 Clinical Filling Solutions, Inc., Hanson Irwin Group LLC, David Teer, Lisa Hudanich, Matthew Ludowig, Marc Hanson, Jerry Irwin, and Michael Lambert, | |
|      Defendants. | |

**DEFENDANT MATTHEW LUDOWIG'S OPPOSED MOTION FOR LEAVE TO FILE AN AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT AND TO ASSERT COUNTERCLAIMS**

Defendant Matthew Ludowig ("Mr. Ludowig" and/or "Defendant"), pursuant to Rules 13, 15(a), and 16(b) of the Federal Rules of Civil Procedure, respectfully seeks leave to file an Amended Answer and Affirmative Defenses with Counterclaims to Plaintiff Empower Clinic Services, LLC's d/b/a Empower Pharmacy ("Empower") Second Amended Complaint, a proposed copy of which is attached as <u>Exhibit A</u>.

### I.    <u>INTRODUCTION</u>

Empower initiated this complex case (against just four defendants) in October 2023 with a twenty-six page, eleven count complaint alleging everything from theft of trade secrets to civil conspiracy. Empower then took fourteen (14) months to develop and *expand* its claims, during which it substituted new counsel, asked for and received time for them to get up to speed, and filed two amended complaints, culminating with the Second Amended Complaint that doubled the original number of defendants and filled six more pages with allegations. Significantly, Empower filed its Second Amended Complaint on the last possible day under the Scheduling Order,

December 16, and then, having run out the clock, dropped one of those new defendants—apparently in exchange for his favorable purported testimony against Mr. Ludowig. Next, Empower sprung a spoliation motion on Mr. Ludowig and not only relied on the declaration exchanged for dismissal, but also leaked allegations from the *sealed* motion to the media, thereby disparaging Mr. Ludowig in direct violation of the non-disparagement clause of his Severance Agreement with Empower (and the Protective Order in this case).

Now, defying all notions of fundamental fairness and declining to identify any prejudice that it will suffer (much less unfair prejudice), Empower seeks to insulate itself from its blatant breaches of contract by opposing the Court granting Mr. Ludowig leave to amend, even as to the non-disparagement breach of contract claim that arose ***after*** the deadline to amend pleadings. *Cf. Canal Indem. Co. v. Caljet, II, LLC*, No. 4:19-CV-02945, 2023 WL 3695623, at *1 (S.D. Tex. Jan. 12, 2023) (Bennett, J.) (finding fundamental fairness dictated granting motion to extend deadline for summary judgment motion, where plaintiff had been granted extension to file additional claims after deadline, such that there was no way for defendant to have timely moved for summary judgment on those claims). Empower also hopes to sidestep Mr. Ludowig's dispositive defenses and claims based on ***Empower's written agreement to generally release and not sue Mr. Ludowig for the claims it purports to assert against him in this litigation***.

Empower's opposition amounts to a technical procedural maneuver that runs counter to the Court's "strong preference for resolving disputes on the merits when possible, instead of determining the outcome solely on technical or procedural grounds." *Gray v. Killick Grp., LLC*, No. 4:21-CV-01673, 2022 WL 20688810, at *1 (S.D. Tex. Aug. 4, 2022) (Bennett, J.)(internal quotations omitted)(applying Rule 6(b) standard to motion for extension after deadline had passed).

In contrast, Mr. Ludowig and his new counsel seek to amend his Answer—which Mr. Ludowig filed while represented by former counsel less than ninety-five days ago—to add (i)

meritorious and dispositive affirmative defenses related to Empower's settlement, release, and waiver of claims, Empower's unclean hands, the alleged underlying contracts being void as a matter of public policy, and Empower's fraud, illegality, bad faith, and breach of the duty of good faith and fair dealing, (ii) a breach of contract counterclaim that accrued *subsequent to* the Scheduling Order's pleading amendment deadline and which arises from a contract integral to this litigation, (iii) a breach of contract claim based upon Empower's blatant violation of a Release that it provided to Mr. Ludowig, (iii) an intentional infliction of emotional distress claim based upon recently learned extrajudicial attacks aimed and humiliating, degrading, and causing Mr. Ludowig and his family severe emotional distress and trauma, and (iii) a wrongful discharge claim related to Empower's termination of Mr. Ludowig solely because Mr. Ludowig refused to perform illegal acts and is being targeted by Empower based upon the same.

Empower took 14 months to lock in its complaint, including an 8-month extension after it hired new counsel. Through this Motion and the Motion for Continuance filed last week, Mr. Ludowig is seeking just 3 months to allow his new counsel to develop, vet, assert, and litigate meritorious counterclaims and defenses that are wholly dispositive of Empower's claims. In these circumstances, there is more than good cause to permit Mr. Ludowig and his counsel a fair opportunity to present Mr. Ludowig's case, and it would promote both judicial and litigation economy to grant Mr. Ludowig leave to assert defenses compelling dismissal of Empower's complaint *in toto*. Additionally, the recent discovery of Empower's strategy to offer settlements to Mr. Ludowig's co-defendants (as well as other parties embroiled with Empower in litigation), in exchange for false and defamatory testimony against Mr. Ludowig, creates additionally grounds for Mr. Ludowig's requested extension of time and continuance of trial so that he can adequately present his case.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Empower's History of Illegal Compounding Practices

Empower advertises that it is our nation's "most advanced 503A compounding pharmacy and 503B outsourcing facility."[1] To the contrary, among a host of other illegal compounding practices, Empower purchases cosmetic and food grade—rather than pharmaceutical grade—ingredients that it finds at the cheapest cost from surreptitious providers using such questionable addresses such as floridaeats@yahoo.com. Upon information and belief, Empower distributes these adulterated medications to hundreds of thousands of consumers each year while falsely advertising that it produces "high-quality compounded medications" using "state-of-the-art resources" and "cutting-edge technology."[2]

**B.     Mr. Ludowig Joins Empower and Eventually Confronts Empower About Its Illegal Compounding Practices**

Empower hired Mr. Ludowig in August 2020. (ECF 92 at ¶ 22.) Mr. Ludowig was excited about the opportunity and confident that he could learn to excel in the position, but by any reasonable measure, he was going to have a significant learning curve to be the sole in-house attorney for all of the "nation's largest human drug compounding pharmacy's" legal needs.

Eventually, Mr. Ludowig came to understand why Empower hired him—Empower's CEO wanted a buffer between him and whomever Empower was burning through as the head of compliance and a "yes man" to simply go along with whatever Empower's CEO Shaun Noorian wanted to do. Put another way, it came to appear to Mr. Ludowig that the CEO wanted someone to give him a basis to disregard FDA regulations and allow Empower to continue to pad profit margins through securing cheaper inappropriate ingredients, while simultaneously scaling its business. *See* (ECF 92 at ¶ 22.) Upon information and belief, upon realizing that there could be

---

[1] Empower Pharmacy, *About Us*, https://www.empowerpharmacy.co/about/ (last visited Apr. 9, 2025).

[2] Empower Pharmacy, *Our 503A Facility*, https://www.empowerpharmacy.com/about/technology-innovation/facilities/503a/ (last visited Apr. 9, 2025); *see also Eli Lilly v. Empower Clinic Services, LLC*, No. 2:25-cv-02183, ECF 1 at ¶¶ 63–79 (D.N.J. Apr. 1, 2025) (outlining Empower's long history of failing to comply with state and regulatory agencies).

exposure in this information becoming public, Empower started requiring employees, including Mr. Ludowig, to sign vastly overbroad confidentiality and noncompetition agreements. Revealing their true purpose, Empower selectively enforces these agreements only against employees likely to reveal Empower's medications for what they are worth—a scam. In fact, Mr. Ludowig came to quickly understand that any pushback on Empower's illegal activity would be met harshly.

For example, in or about October 2020, as acting head of HR at Empower, Mr. Ludowig needed to determine the vaccine status of Empower employees for safety purposes during COVID. He developed a plan allowing employees to provide their status anonymously and distributed it to all employees. Mr. Noorian immediately called Mr. Ludowig to curse him out, castigate him, and tell him never to send anything like that out without Mr. Noorian's express approval. This incident was the first, but certainly not the last, time Mr. Ludowig attempted to do the right thing and became the object of Mr. Noorian's ire as a result.

Shortly thereafter, Mr. Ludowig was tasked with helping Empower navigate the aftermath of a California Board of Pharmacy Inspection which had resulted in a 59 count complaint against Empower. Mr. Ludowig managed to secure settlement of the complaint in December 2023, had to apologize profusely throughout the process for Mr. Noorian's attitude toward the Board and its findings. During this time, when Mr. Noorian was expressing his frustration with criticism from inspectors and their refusal to accept his incorrect interpretations of the rules, Mr. Noorian asked Mr. Ludowig to draft the first iteration of Empower's Confidentiality and Non-Compete agreements, with plans to distribute them company-wide. Upon information and belief, these "agreements" and this strategy have become a staple of Empower's business model—interpret the rules however you want, do what you want, and then make sure that nobody can talk about it. Even today, it has been reported that Empower withholds pay due to employees until they sign an updated non-compete, restrictive covenant, and release.

Another strategy employed by Mr. Noorian which Mr. Ludowig observed repeatedly is to degrade, discredit, and attack anyone who leaves Empower—especially anyone who has observed illegal conduct during their time with Empower. Mr. Ludowig has witnessed firsthand how individuals who were vocal against Empower's compounding practices are treated by Empower and Shaun Noorian, when he was asked "to deal with" an employee who had been critical of Empower's 503A and 503B operations. Eventually, he, like other C-level executives, were either fired or forced to resign. Around this time, Greg Nicholas joined Empower as its Chief Technology Officer. Mr. Nicholas is currently suing Empower for failing to pay installments due to him per his severance agreement—which upon information and belief, Empower is withholding, once again, based upon fabricated claims of breach of his confidentiality agreements.

It is not surprising that Empower has continued to get warnings, adverse observations, and notices regarding its illegal compounding practices. In November 2021, Empower received a warning letter from the FDA regarding the biologic, Human Chorionic Gonadotropin (HCG).[3] As a result, Empower was forced to stop dispensing its most profitable drug product, HCG. As a result of that, and the startup costs associated with moving into its new 503A facility in early 2022, Empower began a period of financial hardship. In April 2022, Empower began the process of attempting to raise outside capital. At the same time, Empower was also attempting to assess its compliance within its 503B, understanding that FDA inspections normally take place every 2 years and this inspection would be particularly important given the capital raise. To assist in this assessment, in June 2022 Empower hired Amicus Consulting Group to perform an audit of Empower's 503B in anticipation of upcoming audits. Empower was advised by Amicus to recall

___

[3] The Iowa Board of Pharmacy issued a warning to Empower; ordered it to permanently halt shipments of compounded HCG into Iowa; placed Empower's pharmacy license on probation for three years; and imposed a $25,000 civil penalty. Empower challenged the Board, lost, and then appealed to the Iowa Supreme Court. Oklahoma imposed a fine of $37,200 against Empower over the same issue. In 2019, the FDA notified Empower it had violated FDA regulations by failing to have on file any FDA-approved applications for new drug products it was compounding. The agency also alleged Empower violated regulations on misbranded drug products by compounding products intended for conditions that are not amenable to self-diagnosis and treatment.

certain batches of drug product based on concerns with the sterile environment in which the drugs were made. Empower, at the direction of CEO Shaun Noorian decided to overrule not only the recommendation provided by Amicus, but also Mr. Ludowig's legal advice and the advice of the CFO, Rob Hopkins, and the batches were not recalled.

In August 2022, the FDA conducted an inspection of Empower's 503B facility during which it discovered that Empower was using cosmetic and food grade Active Pharmaceutical Ingredients (API), among a host of other concerning observations. This practice was something else which Mr. Ludowig and others at Empower, including Empower's Director of Supply Chain, confronted Empower leadership about—advising that they could not do this legally. Mr. Noorian did not care but continued to direct that the cheapest API be purchased and used. By this time, Mr. Ludowig clearly understood the issues and was starting to push back more aggressively.

At that point, around the fall of 2022, Mr. Ludowig had his Compliance officer, Norita Persuad, draft two memoranda: (1) an internal GAP analysis addressed to Mr. Ludowig and (2) an email to Shaun Noorian explaining that as many as 60 percent of Empower's prescribers (those actually prescribing Empower's non-FDA-approved compounded medications to patients) were not licensed appropriately. Again, Mr. Noorian did not care but this was the pre-cursor to the retaliation that Mr. Ludowig would soon face for his confronting Mr. Noorian and refusal to participate in the illegal practices at Empower endorsed by him.

By early 2023, Mr. Ludowig had developed substantial experience in the industry, and, with the help of numerous damning FDA audits and state board of pharmacy complaints, realized that Empower's operations were far outside compliance with FDA regulations. In January 2023, Mr. Ludowig garnered the courage to confront Empower's CEO and COO about Empower intentionally disregarding an FDA directive prohibiting Empower from manufacturing GLP-1 weight loss drugs using semaglutide salts, so that consumers would not be injecting unapproved, untested salts along with their weight-loss injections. The FDA had instructed companies like

Empower to use the semaglutide *base* forms from FDA-registered facilities in compounding GLP-1s, to ensure the active ingredients were more akin to the commercially available drugs Mounjaro, Wegovy and Ozempic. In opposition to Empower's CEO's directive, Mr. Ludowig sent a memorandum to Empower executives, including its CEO, expressly explaining that it was illegal for Empower to continue to use semaglutide salt forms to compound GLP-1s and that he would no longer simply go along with and participate in illegal activity. In retaliation, Empower demoted Mr. Ludowig and eventually constructively fired him.

At this point, it was apparent that Empower's CEO realized that Mr. Ludowig would not be the "yes man" with no experience that he had intended to hire. Less than two weeks after indicating that he would no longer be a party to Empower's illegal practices, Empower's CEO notified Mr. Ludowig the company would be hiring a new General Counsel and demoting him. To replace Mr. Ludowig, Empower recruited numerous candidates to no avail. When they located acceptable candidates, such as Cyndi Bailey and Jeffery Torres, those individuals either quickly resigned or were terminated. Since then, it appears that Empower has continued to hire attorneys with little to no experience in the pharmaceutical compounding industry.

For Mr. Ludowig, after his demotion, the situation became so toxic that Mr. Ludowig could not stay. This constructive discharge forced Mr. Ludowig to give up substantial compensation in exchange for a release, knowing that he was likely going to be a target after he left Empower. It turns out his fears were justified.

The final confrontation with Mr. Noorian which accelerated Mr. Ludowig's discharge day centered around Mr. Ludowig's legal opinion that Empower was illegally conducting fundraising efforts related to "friends and family" fundraising efforts (as discussed in more detail below).

## C.    Empower Forces Mr. Ludowig into a Severance Agreement with a Non-Disparagement Clause after Ludowig's Final Objection to Illegal Practices

In August 2023, Empower and Mr. Ludowig entered into a severance agreement that was a "reconsideration of the Severance Agreement and the Phantom Plan." Curiously, this Agreement is not referenced in or attached to Empower's Second Amended Complaint (or any prior iteration of the same), but is actually the operative agreement, clearly superseding the contracts upon which Empower purports to base its claims against Mr. Ludowig. Ex. A; ECF 92.

The Severance Agreement (titled "General Waiver and Release") followed immediately after Mr. Ludowig's final objection to Empower's illegal conduct, which related to fundraising efforts. In 2023 Empower had failed to convince private equity funding sources that it was a good investment, so CEO Noorian decided to pivot to "friends and families" funding to grow the company. During this time, Noorian hired an interim GC who was placed over Mr. Ludowig, an attorney named Len McGill. As is the norm at Empower, Mr. McGill was not experienced in compounding or regulatory compliance in the pharmaceutical industry. He was, however, an experienced transactions attorney and identified serious concerns with Empower's potential misrepresentations to potential friends and family "investors." Yet, it was Mr. Ludowig who expressed the greater concern with the illegality of Empower's actions and who took the courageous step of once again confronting Empower's CEO with the fact that what he was doing was illegal and could expose Empower to legal liability.[4] Specifically, Mr. Ludowig raised anti-kickback and disclosure concerns with Mr. Noorian's fundraising efforts. These concerns were aired in July 2023 and ultimately turned into another memorandum outlining the concerns of

---

[4] Regulation D is a Securities and Exchange Commission (SEC) regulation governing private placement exemptions. Rule 506(b) is one of the rules under Regulation D. Rule 506(b) is particularly useful for early-stage fundraising, often known as "friends and family" rounds It allows companies to raise an unlimited amount of funds from an unlimited number of accredited investors and up to 35 non-accredited investors who meet certain sophistication criteria. Importantly, it prohibits companies from using general solicitation or advertising to market the securities. Under Rule 506(b), if a company includes non-accredited investors in its offering, it must provide them with disclosure documents that generally contain the same information as provided in registered offerings. The company must also be available to answer questions from prospective purchasers.

illegality expressed by Mr. Ludowig and why he would not participate. Shortly thereafter he was finally fired.

Just a couple of weeks later Mr. Ludowig and Empower executed the severance agreement identified in Exhibit A. Notably, in addition to releasing Mr. Ludowig from "any and all Claims that [Empower] . . . ever had, now ha[s] or may have against [Ludowig], whether known or unknown to [Empower], by reason of [Ludowig's] employment and/or the cessation of [Ludowig's] employment with the Company, or otherwise involving facts that occurred on or prior to the date that [Ludowig has] signed this Release," Empower also agreed via the Severance Agreement that Empower "shall not at any time now or in the future make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or *disparaging remarks, comments, or statements* concerning [Ludowig]." Ex. A ¶¶ 2, 7 (emphasis added). Empower also sought to shield its behavior by limiting Mr. Ludowig's ability to file a lawsuit against Empower. Id. ¶ 3. But, as for the retaliation Mr. Ludowig faced, including his demotion and constructive firing, those claims cannot be released as a matter of law and public policy. Moreover, Empower's own breach of the agreement, and claims for its wrongful discharge in retaliation, are beyond the reach of Empower's efforts to hide its own illegality.

**D.** **Procedural Posture: Empower Amends Its Pleading Without Seeking Leave of Court**

Despite this Severance Agreement, Empower filed its original complaint in this case in October 2023 and then amended to add Mr. Ludowig in December 2023, bringing claims against him which are based on matters that arose by reason of Mr. Ludowig's employment and/or cessation of employment, and which were almost exclusively based upon facts that occurred before Mr. Ludowig signed the Release, *i.e.*, claims that are clearly released by the Severance Agreement. (ECF 1, 92.) After Mr. Ludowig prevailed at the preliminary injunction hearing, Empower enlisted new counsel, who entered its notice of substitution in June 2024 and immediately moved for an enlargement of the Scheduling Order to allow them time to familiarize themselves with the case.

(ECF 70–71, 76, 79.) Mr. Ludowig did not oppose this request, and the Court granted Empower's Motion for Continuance and set the amendment of pleadings deadline on December 16, 2024. (ECF 78.) On the last day to amend its pleading under the Amended Scheduling Order, Empower filed its second amended complaint—without seeking leave of court. (ECF 92.) Mr. Ludowig answered the amended pleading on January 8, 2025.  (ECF 99.)

Prior to this motion, Mr. Ludowig had not requested any continuance of the pleadings deadlines but did agree to Empower's requested extensions.[5]

**E.      Subsequent to the Pleadings Amendment Deadline, Empower Disparages Mr. Ludowig and Deploys Tactics Designed to Defame Mr. Ludowig**

On February 26, 2025, Empower settled with a co-defendant, Michael Lambert, and had Mr. Lambert execute a declaration in support of Empower's case. While the declaration is riddled with false statements and other facts that Mr. Lambert purportedly "learned" during litigation (which Mr. Ludowig understands to be statements that Empower prepared and told him to sign), the declaration shifted the landscape of the case. Mr. Ludowig recognized that Empower's true goal in this litigation is to target him. Mr. Ludowig then learned that Empower was also offering settlement to other co-defendants (who were represented by Mr. Ludowig's former counsel) if the co-defendants would provide similar declarations. Empower creating this ethical and strategic conundrum forcing Mr. Ludowig to retain the new, undersigned counsel, who entered its substitution of counsel on April 1, 2025.

Meanwhile, Mr. Ludowig also became aware of an article published in the Texas Lawyer that directly quotes and discusses at length Empower's "SEALED MOTION" for sanctions (ECF No. 105).[6] Given that no one else had access to the sealed motion, it appears Empower made and

---

[5] Mr. Ludowig filed a Motion for Enlargement of the Scheduling Order and continuance of trial for 90 days on April 11, 2025. (ECF 133).

[6]      *See*      https://www.law.com/texaslawyer/2025/01/31/general-counsel-accused-of-destroying-evidence/?slreturn=20250408-32442 (last visited April 7, 2025). A copy is attached hereto as Exhibit B.

communicated disparaging statements about Mr. Ludowig to the Texas Lawyer to be published online—in blatant violation of the Severance Agreement. Ex. C. (ECF No. 19). Empower's disregard for the Severance Agreement does not stop there. Other articles reporting on the sealed motion for sanctions list a public relations firm as the "media contact" for inquiries about the motion for sanctions—*i.e.*, it appears Empower hired a PR firm to coordinate a disparaging media campaign against Mr. Ludowig and disclose the sealed motion, knowing that Mr. Ludowig was hamstrung by the Protective Order and the Court's Order sealing the motion. The PR firm Empower deployed as a hired gun does not hide its goal, as it boasts:

> Fortune magazine has called our founder and Chairman "***one of the most accomplished practitioners of the dark arts of public relations***." The Financial Times called him, "***The spin doctor's spin doctor***. The Editor of Los Angeles Magazine said, "Sitrick is a pure product of the 24-hour news cycle, of a culture dominated and defined by newspapers, magazines, TV, radio, the Internet of the never-ending noise streaming into our lives. Beyond his aggressiveness, beyond his toughness, ***what distinguishes Sitrick is his ability to play the media to his client's advantage***."

https://www.sitrick.com/ (last accessed April 10, 2025) (emphasis added).

Accordingly, based on these developments—the blatant violations of the disparagement clause in the Severance Agreement after the pleadings deadline, Mr. Ludowig realizing the extent of Empower's[7] underhanded tactics, and Mr. Ludowig realizing that Empower's material breach of the Severance Agreement excused his performance under the Agreement and permits him to bring his retaliatory wrongful discharge claim—Mr. Ludowig respectfully requests leave to amend its Answer to add equitable defenses and assert counterclaims for breach of contract, intentional infliction of emotional distress, and wrongful discharge and retaliation.

### III.      MEMORANDUM OF LAW

---

[7] Out of an abundance of caution, the undersigned clarifies that it does not intend to accuse Empower's *counsel* of any ethical violations. Rather, it appears Empower—and its CEO's infatuation with disparaging Mr. Ludowig and other employees who confront him about the sham business that Empower operates—is behind the inappropriate tactics deployed in this matter.

## A. Legal Standard

Rule "16(b) governs [the] amendment of pleadings after a scheduling order's deadline to amend has expired." *Marathon Fin. Ins., Inc. v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009). "Once a scheduling order deadline to amend a pleading has expired, the party seeking to amend is effectively asking the court for leave to amend both the scheduling order and the pleading." *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 694 (S.D. Tex. 2009). Rule 16(b)(4) provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *S & W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003) (cleaned up).

In the Fifth Circuit, to determine whether good cause exists, district courts are required to consider four factors: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Marathon Fin. Ins., Inc.*, 591 F.3d at 470 (cleaned up). When a movant has demonstrated good cause to amend the scheduling order under Rule 16(b), then the more liberal standard of Rule 15(a) will apply to the district court's decision to grant or deny leave.

Federal Rule of Civil Procedure 15(a)(2) allows a district court to give leave to amend a pleading and leave to amend should be freely given "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). Although the decision rests within the sound discretion of the district court, the Rule "evinces a bias in favor of granting leave" and thus a district court should possess a "substantial reason" for denying a request for leave to amend. *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985) (cleaned up). Accordingly, a motion for leave to amend should not be denied unless there is undue delay, undue prejudice to the nonmoving party, or if the movant is acting in bad faith or

with a dilatory motive or has otherwise previously failed to cure deficiencies in his pleadings by prior amendments. *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.,* 786 F. Supp. 2d 1202, 1206 (S.D. Tex. 2009).

**B.        Good Cause Exists to Allow Mr. Ludowig to Modify the Scheduling Order**

All four factors that the Fifth Circuit considers in determining good cause to amend a scheduling order weigh in favor of Mr. Ludowig. *See Marathon Fin. Ins., Inc. v. Ford Motor Co.,* 591 F.3d 458, 470 (5th Cir. 2009).

1.        There Is a Legitimate Explanation for the Failure to Timely Move for Leave to Amend

First, Mr. Ludowig has sound reasons for the timing of this Motion to Amend. He could not have amended to add a counterclaim for breach of contract based on disparagement before the pleadings deadline, because the facts underlying this claim had yet to be discovered or even occur. *See N. Am. Co. for Life & Health Ins. v. Sedlmair*, No. 4:19-cv-00802-O, 2020 WL 13490843, at *1 (N.D. Tex. Sept. 30, 2020) (parties cannot "be expected to amend pleadings alleging new facts and claims before learning of the new facts."). Accordingly, Mr. Ludowig should be granted leave to amend because Empower's own actions subsequent to the pleadings deadline give rise to the claim.  If parties like Mr. Ludowig were not allowed to amend their pleadings under these circumstances, deep-pocketed parties like Empower would be incentivized to simply wait until after pleadings deadlines to engage in smear tactics that give rise to new claims and create leverage in the litigation, leaving individuals like Mr. Ludowig at a disadvantage in trying to adequately pursue the claims through separate, piecemeal litigation.

Second, although some of Empower's retaliatory actions took place long ago, Mr. Ludowig has only recently learned of new facts that caused him (and his new counsel) to recognize the basis for the proposed amended claims—*i.e.*, Empower's selective enforcement of noncompetition agreements, Empower's harassment and outrageous efforts to not only terminate him for objecting

to Empower's illegal conduct but also to humiliate him, hurt his prospects for employment and cause him severe emotional distress after wrongfully terminating him. Mr. Ludowig also learned that other C-level former employees who had not reported or threatened to report illegal activity were not being targeted and retaliated against, and that his claim is not barred by the Severance Agreement.[8] Finally, Empower's efforts to secure false and defamatory testimony against Mr. Ludowig in exchange for settlement and/or compensation in other litigation only recently surfaced. Mr. Ludowig was unaware of these facts at the time of his most recent Answer that he filed less than ninety-five days ago; he recently learned of these new facts that demand real-time strategic adjustments. *See Thomas v. St. Joseph Health Sys.*, No. 5:20-cv-028-H, 2022 WL 4349319, at *6 (N.D. Tex. Sept. 19, 2022) (stating courts find good cause where a "movant has recently learned of new facts through discovery that demand real-time strategic adjustments") (citing *Robles v. Archer W Contractors, LLC*, No. 3:14-cv-1306-M, 2015 WL 4979020, at *3 (N.D. Tex. Aug. 19, 2015) (sufficient explanation for amendment where party based amendment on information he found in a contract during discovery).

Therefore, because Mr. Ludowig became aware of these new facts alerting him to facts and circumstances that support his claim, he should be granted leave to assert his breach of contract, IIED, and wrongful discharge claims. These claims are not only supported by new evidence, but

---

[8] As noted, Empower's material breach of the agreement excuses Ludowig's performance under the agreement, including his release of Empower and covenant not to sue, and it also appears that any attempt to release a wrongful discharge claim based upon a refusal to perform an illegal act would be void as a matter of public policy. Moreover, to the extent the Court finds that Mr. Ludowig knew about the facts giving rise to the wrongful discharge and retaliation claim but did not bring them in his pleading three months ago, the Court should not weigh this factor against Mr. Ludowig, because he has otherwise diligently litigated this case. *See, e.g.*, *Maynard v. PayPal, Inc.*, No. 18-cv-0259-D, 2018 WL 5776268, at *3–4 (N.D. Tex. Nov. 2, 2018) (finding diligence factor weighed in movant's favor where movant at least exercised some diligence in litigating his case); *Howard v. Medicredit, Inc.*, No. 3:17-cv-3224-D, 2018 WL 3752366, at *2-3 (N.D. Tex. Aug. 8, 2018) (finding good cause where movant was litigating case during delay before moving to amend as discovery shed light on new cause of action).

also provide relevant support and context to why Empower is seeking to disparage and discredit Mr. Ludowig in violation of the Severance Agreement—*i.e.,* Empower seeks to minimize the impact of Mr. Ludowig's knowledge about the extent of Empower's illegal compounding practices by discrediting him.

Similar to the wrongful discharge and retaliation claim, Mr. Ludowig also recently learned of the extent of Empower's retaliatory and targeted conduct, such that he should be permitted to include the proposed additional defenses to present a complete defense of the claims.

        2.    The Importance of the Amendment

The second good-cause factor focuses on the importance of the amendments to the broader litigation. *Thomas*, 2022 WL 4349319, at *8. Courts deem an amendment to be important when it directly impacts a party's prospect of recovery. *Feldman v. Stryker Corp.*, No. 3:18-cv-1416-S, 2020 WL 2507684, at *2 (N.D. Tex. May 15, 2020). Here, Mr. Ludowig's proposed claims provide grounds for him to recover *and* dispositive defenses. Therefore, the requested amendments are exceedingly important. *See Kouzbari v. Health Acquisition Co., LLC*, No. 3:18-cv-0126-D, 2018 WL 6514766, at *3 (N.D. Tex. Dec. 1, 2018) (holding amendments are important where amendment provides grounds to recover); *Drerup v. Consolidated Nuclear Security, LLC*, No. 2:19-cv-106-BR, 2020 WL 13608059, at *1–2 (N.D. Tex. Oct. 6, 2020) (finding amendments important where affirmative defenses may absolve defendant from liability). Here, amending to add Empower's breach of the Severance Agreement's release and defense based on that general release, would not only allow Mr. Ludowig a claim for damages, but also completely absolve him.

Moreover, all of the facts related to Empower's claims, Mr. Ludowig's Affirmative Defenses, and the proposed Counterclaims are intertwined and based largely upon facts occurring during the same periods of time, so having them all before the trier of fact at one time is efficient and, more importantly, just. For example, the facts underlying Mr. Ludowig's breach of contract disparagement claim relate to Empower's credibility, bias, and motive in pursuing this action,

which are already at issue. Further, facts relating to Empower disregarding provisions in contracts with Mr. Ludowig, disparaging him, and targeting him for other reasons (such as malice and retaliation for refusing to take illegal acts) cuts directly against any claim by Empower that Mr. Ludowig breached any fiduciary duty or compromised any of Empower's trade secrets or confidential information. Meanwhile, despite the Severance Agreements clearly superseding the contracts upon which Empower apparently relies, Empower is alleging Mr. Ludowig is the only party that breached any contract, which is categorically false and, again, impacts Empower's credibility. These facts also relate to Mr. Ludowig's existing defenses to Empower's restrictive covenant claims: Empower is seeking to punish Mr. Ludowig for speaking up by precluding him from earning a livelihood in any capacity in the pharmaceutical industry for three years—a vastly overbroad noncompetition covenant that is not remotely tailored to any legitimate business interests, and engaging a PR firm to further disparage, harass, and harm him. Mr. Ludowig should be allowed to present all of these facts in one proceeding where the jury has the benefit of all facts relevant to all of the claims and defenses by both parties.

Indeed, the retaliation and wrongful discharge claim is *crucial* to the underlying litigation, because it (i) provides background on the relationship between Mr. Ludowig and Empower, such that it informs why Empower is disparaging and maliciously targeting Mr. Ludowig, and (ii) relates to Empower's unclean hands and why Empower—who is actively disregarding FDA regulations and placing thousands of consumers at risk of harm each day—should not be allowed to enforce grossly overbroad restrictive covenants as a matter of public policy. The wrongful discharge and retaliation claim is also important because it adds a claim—which Mr. Ludowig only recently became aware of—upon which Mr. Ludowig can recover. *See Maynard v. PayPal, Inc.*, No. 3:18-cv-0259-D, 2018 WL 5776268, at *4 (N.D. Tex. Nov. 2, 2018) (finding an amendment important when it adds claims upon which the party can recover); *accord Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 2009 WL 3074618, at *37 (N.D. Tex. Mar. 30, 2009);

*The Richards Group, Inc. v. Brock*, 2008 WL 1722250, at *2 (N.D. Tex. Apr. 14, 2008). Similarly, Mr. Ludowig's recent discovery of Empower's hiring of Sitrick and Company to publicly disparage Mr. Ludowig further justifies this request.

Finally, Mr. Ludowig seeks to add affirmative defenses that (i) clarify his defenses based on the Severance Agreement to ensure Empower does not argue there was a waiver of these defenses that absolve him from liability, (ii) add defenses based on Empower's bad faith illegal conduct, which will similarly absolve him from liability, and (iii) add defenses related to any claim that he misappropriated any of Empower's trade secrets or confidential information. These affirmative defenses are critical to Mr. Ludowig presenting a complete defense and will absolve Mr. Ludowig from any and all liability, as the Severance Agreement specifically prohibits any action against Mr. Ludowig based "by reason of his employment and/or cessation of employment" or "otherwise involving facts that occurred prior to" him signing it.

Mr. Ludowig should not be precluded from sharpening his affirmative defenses related to this Severance Agreement to ensure Empower does not raise technical grounds to circumvent the Severance Agreement's impact. As the Court is surely aware, the law favors resolution of matters on the merits, not by technicality. But if Mr. Ludowig is denied leave to amend, Empower may be able to escape these dispositive defenses with a technical waiver argument. *Drerup*, 2020 WL 13608059, at *1–2 (finding good cause existed to add affirmative defenses where defenses may absolve defendant of liability). Such a result would be patently unfair to Mr. Ludowig.

3.    The Potential Prejudice in Allowing the Amendment, If Any, Can Be Cured by a Continuance

The third and fourth factors focus on prejudice to the nonmovant if the amendment is allowed, and, if there is any prejudice, whether a continuance would cure that prejudice. *Thomas*, 2022 WL 4349319, at *8. This factor typically focuses on a *plaintiff's*—not defendant's— amendment that seeks to avoid summary judgment, which is not present here. *Id.* at *9. Courts

also look to whether the amendments will prolong the litigation, delay resolution of the case, or drastically reframe the suit. *Id.* Here there can be no prejudice or surprise to Empower and if there is, Ludowig has already sought a continuance and would be amenable to further extension if sought by Empower.

Additionally, there is significant discovery burden on the parties outside what should have been anticipated based on what was already known. For instance, the same facts underlying the wrongful discharge and retaliation claim and affirmative defense amendments relate to Mr. Ludowig's existing defense of whether Empower—which illegally compounds medications while disregarding and retaliating against whistleblowing employees—can come to the Court to request enforcement of three-year, nationwide prohibitions on working in the pharmaceutical industry in any capacity to protect its market share and profit margin. *See Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 776 (Tex. 2011) (if the covenant "is merely to restrain competition, and enhance or maintain prices," there is no primary and lawful purpose of the relationship "to justify or excuse the restraint."). Empower seeks to enforce contracts and thus can claim no surprise related to the very "Contract" which is controlling—and is central to Mr. Ludowig's defenses to Plaintiff's claims. Moreover, the recent discovery of the Lambert situation and Sitrick and Company involvement impact witness bias, Plaintiff's credibility, and whether or not Plaintiff's claims are for a proper purpose or motivated by malice. Empower cannot be surprised that the Lambert situation might require inquiry into bias of witnesses secured by them to provide false testimony against Ludowig. Indeed, there is substantial overlap between the issues in the current litigation and the amendments sought by Ludowig. *See Kouzbari*, 2018 WL 6514766, at *4 (granting leave to amend where substantial overlap existed between facts in litigation and requested amendments). Here, Empower cannot claim any prejudice but even if it could, justice requires that Mr. Ludowig be permitted to present all of his defenses and counterclaims because Empower does not have

clean hands. *Cf. Thomas*, 2022 WL 4349319, at *9–10 (allowing amendment even where prejudice existed to non-movant)

In fact, the addition of these counterclaims promotes overall judicial economy by avoiding piecemeal litigation and allowing these claims to be adjudicated at the same time. *See Def. Distributed v. Bruck,* 30 F.4th 414, 427 (5th Cir. 2022) (holding that "[u]nder the [Federal Rules of Civil Procedure], the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties") *(*quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966)) (cleaned up).

Finally, to the extent any prejudice exists, Mr. Ludowig has proposed a very modest three-month continuance of discovery to allow plenty of time for Empower to conduct discovery on these claims and would agree to further extension if Empower sought one. Thus, the availability of a continuance supports granting this request.

## C. Justice Requires Granting Leave to Amend

Having demonstrated good cause exists to extend the deadline for amending pleadings, justice requires the Court to freely grant leave under Fed. R. Civ. P. 15(a) for Mr. Ludowig to file an amended Answer and counterclaims. Indeed, where a party satisfies the stricter "good cause" standard to extend an expired deadline, courts find that justice requires the amendment. *E.g., Thomas*, 2022 WL 4349319, at *11; *Kouzbari*, 2018 WL 6514766, at *4.

## IV. CONCLUSION

For these reasons, Mr. Ludowig respectfully requests that the Court grant this Motion and give Mr. Ludowig leave to file the attached First Amended Answer and Counterclaims. Mr. Ludowig submits the attached proposed order for the Court's consideration.

**KABAT CHAPMAN & OZMER LLP**

*/s/ Aaron A. Wagner*
Aaron A. Wagner
Texas Bar No. 24037655

S.D. Texas Bar No. 3813191
KABAT CHAPMAN & OZMER, LLP
171 17th Street NW, Suite 1550
Atlanta, Georgia 30363
Tel: (404) 370-7300
Fax: (404) 400-7333
Email: awagner@kcozlaw.com

*Attorney for Defendant,*
*Matthew Ludowig*

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(D), I hereby certify that on April 4, 2025, undersigned counsel conferred (by way of a video teleconference meet-and-confer) with Plaintiff's counsel about this request, and Plaintiff's counsel indicated they needed to confer with their client on the request first. The undersigned discussed this request again on April 17th during a conference on Ludowig's anticipate motion to seal this filing and confirmed that Empower would not agree to this request. Again, on April 18, I offered to confer further with Plaintiff's counsel, Mike Bernick, if he thought further conference might allow Empower to agree with this relief. In response, Mr. Bernick indicated that Empower was opposed to this relief and did not seek further conference.

Dated: April 18, 2025.

*/s/ Aaron A. Wagner*
Aaron A. Wagner

<u>**CERTIFICATE OF SERVICE**</u>

This certifies that on April 18, 2025, a true and correct copy of the foregoing **DEFENDANT MATTHEW LUDOWIG'S OPPOSED MOTION FOR LEAVE TO FILE AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT AND TO ASSERT COUNTERCLAIMS** was forwarded to all counsel of record pursuant to the Federal Rules of Civil Procedure.

*/s/ Aaron A. Wagner*
Aaron A. Wagner