**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

EMPOWER CLINIC SERVICES, L.L.C.,

      Plaintiff,

v.

BIO FILLING SOLUTIONS F/K/A BIO42
CLINICAL FILLING SOLUTIONS, INC.,
HANSON IRWIN GROUP LLC, DAVID
TEER, LISA HUDANICH, MATTHEW
LUDOWIG, MARC HANSON, JERRY
IRWIN, AND MICHAEL LAMBERT,

      Defendants.

Civil Action No.: 4:23-cv-4123

**EMPOWER CLINIC SERVICES, L.L.C.'S RESPONSE TO DEFENDANT LUDOWIG'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT RYAN LAMOTTA**

Plaintiff Empower Clinic Services, L.L.C. ("Empower") opposes Defendant Ludowig's motion to exclude the opinions and testimony of Empower's damages[1] expert Ryan LaMotta. Ludowig's co-defendants did not join this (now second) motion. *See* Dkt.135, 140. As explained below, Ludowig's motion should be denied because LaMotta's testimony satisfied all requirements for admissibility under the applicable standards. LaMotta is qualified to offer damages opinions, his methodology is reliable, and his opinions will assist the trier of fact in determining appropriate damages in this trade secrets case. Ludowig spends much of his brief disputing liability for Empower's claims against him, despite the fact that liability is presumed in a damages expert's testimony. Ludowig then argues that (1) LaMotta is unqualified because he is not an expert in compounding pharmacies, despite the fact that, as noted, LaMotta will presume

---

[1] The term "damages" is sometimes used in this brief and elsewhere as a catch-all term that includes other types civil remedies such as unjust enrichment.

1

liability and testify about the resulting unjust enrichment and damages; (2) LaMotta's methods of measuring unjust enrichment and damages are "not legally recognizable" and "imaginary," ignoring the plain statutory language and well-settled case law recognizing these civil remedies; (3) LaMotta impermissibly relied on various billing invoices, payroll information, employee hours' estimations, other expert reports, and other information, when, at most this goes to the weight, not admissibility, of LaMotta's testimony; and (4) the Court should, as a discovery sanction, preclude LaMotta from testifying, despite the fact that there was no discovery violation, let alone a sanctionable one.

As set forth below, Ludowig's arguments lack merit, and LaMotta's proffered expert testimony is admissible. He is an eminently qualified damages expert. LaMotta's proffered testimony covers topics that are standard for damages experts in intellectual property cases, it will help the jury understand the evidence, it is based on sufficient facts, and it is grounded on sufficient principles and methods that have been reliably applied. FED. R. EVID. 702. Ludowig will have ample opportunity to challenge LaMotta's testimony through cross-examination and presentation of contrary evidence, and Ludowig's challenges, such as they are, go to the weight, not the admissibility of the expert testimony. Accordingly, the Court should deny his (second) motion to exclude LaMotta's testimony.

## I.      LEGAL FRAMEWORK

Pursuant to Rule 702, a party seeking to introduce expert testimony must show that (1) "the expert's 'other specialized knowledge' will help the trier of fact understand the evidence or determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Following guidance

from *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd., v. Carmicheal*, 526 U.S. 137, 147 (1999), the trial court acts not as a "fact finder" but as a "gatekeeper," ensuring that the proffered expert evidence is both reliable and relevant. *Daubert*, 509 U.S. at 597. As part of its gatekeeping function, a trial judge has the discretion to use the *Daubert* factors with flexibility to assess the reliability of expert testimony on a case-by-case basis. In the context of evaluating expert testimony regarding damages in trade secret actions, the Fifth Circuit has recognized a "variety of approaches [that] demonstrates the 'flexible' approach used to calculate damages for claims of misappropriation of trade secrets." *Bohnsack v. Varco*, L.P., 668 F.3d 262, 280 (5th Cir. 2012) (citing *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974)).

Exclusion of expert testimony is "the exception rather than the rule," and challenges typically go to the weight, not the admissibility, of the expert's testimony. *Bulox v. CooperSurgical Inc.*, 2025 WL 642245, at *2 (S.D. Tex. Feb. 27, 2025) (quoting *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" is the more appropriate method of addressing even "shaky but admissible" expert testimony. *Puga*, 922 F.3d at 294 (quoting *Daubert*, 509 U.S. at 596). As this very Court noted, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Barone v. Ethicon Inc.*, 2022 WL 22869754, at *3 (S.D. Tex. Mar. 29, 2022) (quoting *U.S. v. 14.38 Acres of Land*, 80 F. 3d 1074, 1077 (5th Cir. 1996) (cleaned up)). "Typically, juries should 'hear the expert's testimony and decide whether the predicate facts are accurate.'" *Barone* at *3 (quoting *Ureteknologia De Mexico S.A. De C. V. v. Uretek (USA), Inc.*, 434 F. Supp. 3d 517, 529 (S.D. Tex. 2020)); *see also Orthoflex,*

*Inc v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 792 (N.D. Tex. 2013) (holding that a party may "cross-examine [an expert] on whether his damages calculations adequately account for other variables that may have caused a change in" damages, and that such "challenge[s] go[] to the weight of [the expert's] testimony, not its admissibility.").

## II.    ARGUMENT

### A.    LaMotta is Eminently Qualified to Offer Testimony and Opinions About Damages In This Case

Rule 702 provides that the proffered expert witness must have "knowledge, skill, experience, training or education." Fed. R. Evid. 702. "The witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (internal quotation marks omitted). The qualifications issue has been described as presenting a "low threshold" for the proponent to clear. *Thomas v. Deloitte Consulting LP*, 2004 WL 5499955, at *3–4 (N.D. Tex. Nov. 30, 2004). Although LaMotta is most assuredly highly qualified with sterling qualifications, the Fifth Circuit has held that "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.' Although an expert's qualifications may be less-than-sterling, she may still be certified.'" *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018) (quotations and citations omitted).

Here LaMotta is more than qualified as a damages expert. He has extensive education, experience, and training in business, finance, valuation, and damages matters. He is a business advisor and consultant who has studied economic damages for over 15 years, including in trade secret matters in a variety of industries. Wagner Declaration, Ex. B. ("LaMotta Report" at ¶¶ 2-4). LaMotta is also a Certified Licensing Professional, a member of the National Association for Business Economics and the Houston Intellectual Property Law Association, and is a co-author of

the Trade Secret Damages chapter in the book *Calculating and Proving Damages,* Law Journal Press (2016). *See, e.g.*, Dkt. 135-2 at ¶¶ 2–4. He holds a B.B.A. and an M.B.A. from Baylor University's Hankamer School of Business. He has been tendered as an expert, qualified by courts/adjudicative bodies as such, and provided court-accepted expert testimony in numerous cases on damages and unjust enrichment issues in federal and state courts around the country, as well as before the International Trade Commission. This includes testifying on the issues of damages and unjust enrichment arising from trade secret misappropriation. Moreover, he has testified specifically about both avoided costs as a measurement of unjust enrichment and reasonable royalty as a measurement of damages in an array of intellectual property cases.

Ludowig's argument that LaMotta is unqualified because he is not a compounding expert is a red herring and misunderstands the nature of damages expertise. Ludowig Brief, pp. 2, 7. Empower is not offering LaMotta as a liability expert or to opine on pharmaceutical industry practices or the technical aspects of compounding pharmacies. LaMotta is a *damages* expert and will testify accordingly. As LaMotta repeatedly made clear in his export report, and as he will make clear in his trial testimony, LaMotta has assumed liability for the purposes of his damages/unjust enrichment analysis. It is axiomatic that damages experts "are permitted to assume the fact of liability and opine about the extent of damages," *Orthoflex, Inc,* 986 F. Supp. 2d at 792, and that "[a]n expert's reliance on assumptions does not itself make the expert opinion unreliable or inadmissible." *See ENGlobal U.S. Inc. v. Native AmServs. Corp.*, 2018 WL 1877015, at *8 (S.D. Tex. Apr. 19, 2018) (citations and quotations omitted); *see also Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, at *4–5 (collecting cases and noting that it is "beyond serious challenge" that a damages expert may assume liability).

Relatedly, damages experts like LaMotta testify in intellectual property-related trials that

involve a wide array of industries. They need not be an expert in any specific industry to render an opinion about economic remedies and damages. Indeed, as noted above, LaMotta has testified as a damages expert in trials involving a broad spectrum of industries. In terms of the scope of his expert testimony, a routine part of an expert's assessment of damages and unjust enrichment necessarily involves analyzing the parties' business operations, the relevant competitive landscape, the nature and importance of the alleged intellectual property, and whether and how the defendant benefited from, and whether and how the plaintiff was harmed by, the alleged misappropriation. *See. e.g., Williams*, 898 F.3d at 624-25 (applying Fifth Circuit case law that "firmly rejected" a "conception of expertise" in which the experts "could not testify about a [product in question] because [it] is not their trade," reasoning that "[s]uch conception of expertise . . . could make expert certification decisions a battle of labels—label the needed expertise narrowly and the offered expert's field broadly, [which] would elevate labels over substance."). Ludowig cites no authority to support his argument to the contrary.

Ludowig's other attacks on LaMotta's qualifications are also meritless. LaMotta has never been precluded from testifying, and his opinions have never been excluded by any court or adjudicative body.[2] Indeed, the case Ludowig referenced in his brief supports *denying*, not granting, the instant motion. Significantly, that case was a *bench trial*, the Court denied the defendant's *Daubert* motion in its entirety, qualified LaMotta as an expert, and permitted him to testify. The Court then sat as a *fact finder* and had the opportunity to weigh LaMotta's testimony—

---

[2] Ludowig grossly mischaracterizes *Childress M.D. v. the Univ. of Colo.*, 2025 WL 2262501 (D. Colo. June 17, 2025), a Colorado state court employment dispute with related patent ownership issues. Contrary to Ludowig's assertion that LaMotta's damages calculations were "excluded" in *Childress*, the defendants filed a *Daubert* motion seeking to exclude LaMotta's opinions, the Court denied the motion in its entirety. After the bench trial, the Court made a specific finding that LaMotta was credible and ultimately awarded damages based on one of his three theories of damages reconstruction costs, rejecting the other two.

testimony that had nothing to do with trade secret misappropriation. That is precisely what should happen in the upcoming trial: LaMotta should be permitted to testify as an expert, and the jury should be given the opportunity to weigh his testimony.

**B.** **LaMotta Employed Reliable and Well Settled Methods of Measuring Unjust Enrichment and Damages**

The Fifth Circuit has held that in analyzing a methodology for measuring damages, it is "enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 330 (5th Cir. 1997). LaMotta's use of unjust enrichment/avoided costs and reasonable royalty are reliable and well settled methods for measuring economic remedies and damages in trade secret cases. Ludowig's hackneyed claim that "Empower did not lose profits" is yet another red herring to add to Ludowig's growing school. Ludowig Brief, pp. 2, 5.

*First*, Ludowig's argument that an injunction renders unjust enrichment damages improper is incorrect. The injunction is designed to prevent the future use of the misappropriated trade secrets, but it does not remedy the past benefits defendants received from their misappropriation. The law contemplates both injunctive relief and damages/unjust enrichment as complementary remedies; they are not mutually exclusive.

A plaintiff does not need to prove actual lost profits to recover an award for damages under the Defend Trade Secrets Act (DTSA) or the Texas Uniform Trade Secrets Act (TUTSA) because both statutes state that "damages for actual loss" are not required; rather, civil remedies may include an award of damages for "any unjust enrichment," or, in lieu of other damage measures, damages measured by "a reasonable royalty" for the misappropriation. *See* 18 U.SC. § 1836(b)(3)(B)(i), (ii); Tex. Civ. Prac. & Rem. Code § 134A.004(a).

Furthermore, the relevant model jury instructions and case law also leave no doubt that

these are cognizable civil remedies. *See* Judicial Council of the United States Eleventh Judicial Circuit Pattern Jury Instructions, Civil Cases (2023), Instruction 11.4; Comm. On Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 115.54; 115.55; *see also Bohnsack*, 668 F.3d 262, 280 (citations omitted) (holding that "[d]amages in misappropriation cases can take several forms: [including] . . . the development costs the defendant avoided incurring through misappropriation, and a 'reasonable royalty'"). Ludowig's specious arguments that unjust enrichment/avoided costs and reasonable royalty methods are "not legally recognizable," "manufactured," "imaginary," and "speculative" ignore statutory text, applicable jury instructions, and case law. Ludowig Brief, pp. 2, 7.  Accordingly, the Court should deny Ludowig's motion.

       1.       **<u>Unjust Enrichment/Avoided Costs Are Legally Recognized, Widely Accepted, and Methodologically Reliable</u>**

The Fifth Circuit has made clear that "Texas takes a 'flexible and imaginative approach' to damages calculation in trade secret misappropriation cases that allows calculation of damages based on defendant's avoided costs," which can be measured by the costs a defendant saved by misappropriating a trade secret. *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 499-500 (5th Cir. 2016) (affirming $15 million trade secret misappropriation judgment under Texas state law, reasoning that "[plaintiff's] expert based his damages opinion on an unjust enrichment theory rooted in research and development costs that [defendant] avoided."). Likewise, federal courts around the country have upheld awards based on avoided costs through misappropriation. *See, e.g., Epic Systems Corp. v. Tata Consultancy Services, Ltd.*, 980 F.3d 1117 (7th Cir. 2020); *PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, 47 F.4th 156 (3d Cir. 2022). It is similarly well settled that use of a plaintiff's actual costs incurred in developing a trade secret is a reliable proxy for measuring the defendant's avoided costs/unjust enrichment. *GlobeRanger*, 836 F.3d at 499 (holding that damages valuations may consider "the development

costs the defendant avoided by the misappropriation ... [and] [t]he costs a plaintiff spent in development ... [which] can be a proxy for the costs the defendant saved.") (citations omitted). *See In re Matter of AmeriSciences, L.P.*, 781 F. App'x. 298 (5th Cir. 2019) and *Epic Systems*, 980 F.3d at 1130.[3]

In any event, Ludowig's argument ignores the other causes of action Empower asserted against him. Even putting aside the DTSA and TUTSA claims, the unjust enrichment/avoided costs method is widely accepted in calculating awards for claims involving unjust enrichment and breach of fiduciary duty. *See, e.g., Matter of AmeriSciences, L.P.*, 781 F. App'x. at 310, 312 (holding that the same expert testimony regarding the defendant's avoided development costs was sufficient to establish damages for the trade secret claim, as well for the breach of fiduciary duty and unjust enrichment claims). *Accord Epic*, 980 F.3d at 1130 (noting that damages award for avoided cost/unjust enrichment applied not only to plaintiff's claim for trade secret misappropriation but also to its claim for unjust enrichment).

### 2.      Reasonable Royalty Is Legally Recognized, Widely Accepted, and Methodologically Reliable

As noted above, the text of the DTSA and TUTSA, along with the relevant jury instructions and case law, leave no doubt that damages for trade secret misappropriation can be measured using a "reasonable royalty" method. Courts have upheld the measurement of a reasonable royalty through the application a variety non-exhaustive factors, including those set forth in *Univ. Computing Co.*, 504 F.2d at 539 and *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp.

---

[3] *Epic Systems,* a case in which LaMotta assisted the plaintiff, is remarkably similar to this action. In that case, the Seventh Circuit affirmed an award of $140 million in compensatory damages for unjust enrichment/avoided costs. *Id.* at 1124. The Court held that the expert's calculation of the plaintiff's costs incurred in developing its misappropriated trade secrets was appropriately used as a proxy for the benefit the defendant unjustly received from its misappropriation. *Id.* at 1130. As here the defendant never ultimately succeeded in entering the U.S. market and competing against the plaintiff.

1116, 1120 (S.D.N.Y. 1970). Contrary to Ludowig's claim that these "apply in patent cases, not a trade secret case like this one," courts routinely apply these factors in trade secret cases. Ludowig Brief, p. 8. *See e.g., Atl. Inertial Sys. Inc. v. Condor Pac. Indus. of Cal., Inc.*, 2015 WL 3825318, at *10–11 (C.D. Cal. June 18, 2015); *Veritas Operating Corp. v. Microsoft Corp.*, 2008 WL 7404617, at *5 (W.D. Wash. Feb. 26, 2008); *StoneCoat of Texas, LLC v. ProCal Stone Design LLC*, 426 F. Supp. 3d 311, 347–48 (E.D. Tex. 2019).

### 3.    Pre-Filing, Non-Litigation Investigation Costs Are Recoverable "Actual Losses" Proximately Caused by Misappropriation

Put simply, the Eleventh Circuit treats money spent before suit to investigate and fix the harm from stolen trade secrets as compensable "actual damages."  There, the Court upheld an award of "actual damages" measured by pre-filing, non-litigation remedial costs incurred to investigate the extent of damages caused by a defendant's trade secret misappropriation. *See Cap. City Home Loans LLC v. Darnell*, 2024 WL 4534567, at *5–6 (11th Cir. Oct. 21, 2024). In *Cap. City* the Court reasoned that, for both DTSA and the Florida Uniform Trade Secret Act (FUTSA), recovery is authorized for "actual loss" flowing from trade secret appropriation. It reasoned that the fact that the work "happens to be done by attorneys" was of no moment, as "the expenses were proximate enough to [defendant's] misappropriation to count as actual losses." *Id.*

Here, as in *Cap. City*, the investigative costs identified by LaMotta represent actual damages incurred by Empower as a direct result of defendants' alleged misappropriation. These costs were necessary to identify the scope of the misappropriation and mitigate its harm. Such costs are recoverable as part of Empower's actual damages under the Defend Trade Secrets Act, which provides for "damages for actual loss caused by the misappropriation of the trade secret." 18 U.S.C. § 1836. Furthermore, as LaMotta will testify, a plaintiff who has had its trade secrets misappropriated and incurs pre-filing *investigative* costs (as opposed to litigation-related

attorneys' fees) has suffered an economic harm. That harm is caused by the defendant's misappropriation. Moreover, if Empower proves willful and malicious misappropriation, it may be entitled to exemplary damages and attorney's fees under both the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act. In that context, evidence of investigative costs is also relevant to the Court's determination of appropriate remedies.  Thus, this method for measuring actual damages under TUTSA and DTSA is reliable because it make economic sense.

Accordingly, LaMotta's unjust enrichment and damages methods are reliable, and he should be permitted to present them to the jury. Ludowig's characterizations of these methods as "not based in the law" and "imaginary" ignores the statutory language, jury instructions, the case law, and sound economic principles.

C.     **LaMotta's Proffered Testimony Is Based on Sufficient Facts and Reliably Applied Methods**

As a threshold matter, although the trial court must ensure that an expert uses reliable methods to reach his opinions, the district court "does not judge the expert conclusions themselves." *See Williams*, 898 F.3d 623. This makes sense because"[t]ypically, juries should 'hear the expert's testimony and decide whether the predicate facts are accurate.'" *Barone*, 2022 WL 22869754, at \*3 (quoting *Ureteknologia De Mexico*, 434 F. Supp. 3d at 539). An expert may base his opinion on facts or data that he has been provided. *See* Fed. R. Evid. 703. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.* Corporate records, and summaries of corporate records, are generally data on which a damages expert may rely. *See In re Promedco of Las Cruces, Inc.*, 2003 WL 21962443, at \*6 (N.D. Tex. Aug. 12, 2003) (citing *Simpson v. James*, 903 F.2d 372, 378 n.20 (5th Cir. 1990)). Similarly, experts are entitled to rely on the reports of other experts. *Marcel v. Placid Oil*, 11 F.3d 563, 567, n. 6 (5th Cir. 1994).

Contrary to Ludowig's assertions, LaMotta's "avoided costs" analysis is based on sufficient facts and reliable methodology.  Consistent with the well-settled case law described above, LaMotta used Empower's costs to develop each of the asserted trade secrets as a proxy for measuring the benefit (in the form of avoided costs) conferred on Ludowig and his co-defendants from misappropriating those trade secrets. This analysis is performed on a trade secret by trade secret basis, providing the jury a clear road map with which it can evaluate defendants' unjust enrichment.  As reflected in LaMotta's report, and as he is expected to testify at trial, for each alleged trade secret, he conducted a detailed and thoroughly documented analysis identifying the level of work and types of costs Empower incurred, the source of the information for those costs (including both bills/receipts for consulting fees and travel expenses, employee payroll information, employee hours, contemporaneous meeting and calendar invites, interviews with Empower employees), his validation of the data, and any assumptions he made.  The approach is documented, grounded in the facts and can be replicated and tested – hallmarks of permissible expert analysis and testimony.

LaMotta's reasonable royalty analysis employs a recognized methodology for calculating damages in intellectual property cases.  Indeed, consistent with the well-settled case law described above, LaMotta measured a "reasonable royalty" from a hypothetical negotiation between the parties. As reflected in LaMotta's report and as he expected to testify at trial, he will explain his methodology, including first creating a baseline valuation of the alleged trade secrets and then examining the relevant factors, including qualitative factors that may influence the outcome of the negotiation require an upward or downward adjustment from that baseline negotiating range. (*See* LaMotta Report Section 7).  He will describe how he arrived at his baseline valuation using a cost approach of approximately $1.1 million.  Then, for each factor, which include relevant *Univ.*

*Computing* and *Georgia-Pacific* factors, LaMotta will explain each relevant factor, any adaptions he made and why, the information he relied on (including any other expert reports) and any assumptions he relied on to assess each factor, and the weight he gave to each and his reason for doing so.

Finally, LaMotta applied sound and reliable economic principles regarding use of remediation costs (in this case Empower's pre-filing investigative costs) to the facts and circumstances of this case. As reflected in LaMotta's report and as he is expected to testify at trial, LaMotta will explain this basis for measuring actual damages, will describe the information he relied on (specifically, billing receipts from Empower's outside counsel), which of those costs he attributed to pre-filing/non-litigation investigation/remediation costs and why, as well as any assumptions or other adjustments he made.

### D.   LaMotta Properly Analyzed Causation, Competition, and Other Relevant Economic Considerations

Ludowig challenges LaMotta's analysis of relevant economic considerations, such a competition between the parties, defendants' use of the trade secrets, and causation between the alleged/assumed wrongful conduct, use of the trade secrets, and benefit received. His argument lacks merit. As set forth in his detailed report, LaMotta's analysis of these considerations is based on, among other things, his review of financial records, business plans, information about the parties' subject products and services, projected sales, investor presentations, marketing materials, interviews of knowledgeable individuals, sworn testimony, and how that information bears on the quantification of damages and unjust enrichment.

As LaMotta will testify, these types of documents and information are routinely analyzed by economic and damages experts. LaMotta has frequently studied these economic issues in performing his work as a damages expert, and he has testified to those findings, including in trade

secret matters. The skills, experience, and expertise that allows one to evaluate economic damages are interrelated with those involving competition, market analyses, and the causal connection between the wrongful conduct and the determination of damages. Indeed, it is commonly accepted that damages experts should evaluate these and other economic issues. For example, the widely referenced *Litigation Services Handbook – The Role Of The Financial Expert* has an entire section dedicated to causation issues and the damages expert's role in evaluating the causal connection. Roman Weil, et al, *Litigation Services Handbook*, Section 4.2 (6th ed. 2017).  It provides that "an expert retained to measure damages must therefore understand and be prepared to explain, among other things, the "defendant's wrongful conduct," "logic that connects the defendant's alleged wrongful conduct and the plaintiff's damages," other factors that could have caused or exacerbated plaintiffs damages, and "[w]hether plaintiff's damages were reasonably expected to result from the defendant's wrongful conduct." *Id.*

The above are the exact types of considerations that LaMotta properly evaluated as part of his work in this case and that any damages expert is expected to do as part of his or her expert testimony. Accordingly, Ludowig's argument that a damages expert should not evaluate economic issues underlying the damages claim makes no sense and is in conflict with the very standards governing expert work.

E.     **Ultimately, Ludowig's Challenges, Such as They Are, Go to the Weight, Not Admissibility, of LaMotta's Testimony and Opinions**

Ludowig will have the opportunity to challenge LaMotta's methodologies, as well as the assumptions and facts to which he applied those methodologies to reach his conclusions. For example, Ludowig will be free to cross examine LaMotta on whether he properly used the "cost approach" when calculating Empower's "reasonable royalty," why he assigned a 50-50 split to the reasonable royalty, and whether he failed to consider other alternative measurements. Ludowig

Brief, pp. 3, 8. Likewise, Ludowig is free to cross examine LaMotta about the facts upon which he relied, including whether LaMotta "randomly assigned" employee hours, "copied and pasted" invoices and costs, "improperly relied" on travel invoices and outside consulting fees. Ludowig Brief, pp. 3, 7. Ludowig is free to ask LaMotta whether, as Ludowig insists, in his report, he "admit[] the alleged trade secrets do not promote revenue." Ludowig Brief, p.7, citing Paragraph 175 of LaMotta Report. (In fact, LaMotta said no such thing. Rather, in his report, in analyzing the appropriate reasonable royalty, LaMotta stated that there was no indication the trade secrets "promote revenue *beyond CDMO services,*" LaMotta Report Para. 175 (emphasis supplied). It is no accident that Ludowig excised these crucial three words from his brief. It is those CDMO services that are at the crux of this trade secret action and the underpinning of LaMotta's conclusions that damages and unjust enrichment are warranted here. Significantly, and fatally to his motion, all of these challenges go to the weight, not admissibility, of LaMotta's testimony. *See Daubert*, 509 U.S. at 596.

      **F.**      **<u>Ludowig's Remaining Arguments Are Equally Meritless</u>**

      **1.**      **<u>There Was No Discovery Violation, Let Alone One Warranting Draconian Sanctions</u>**

Ludowig's claim that a (non-existent) discovery violation requires, as a sanction, the preclusion of LaMotta's testimony lacks merit. First, it is factually incorrect. There was no discovery violation. Empower timely designated LaMotta as an expert and timely produced his expert report. Before the April 4, 2025, discovery cut-off, Ludowig's co-defendant BFS, represented by Anthony LaPorte, timely noticed LaMotta's deposition. *See* Para. 3, Scheduling Order, Dkt. 78 (April 4, 2025, discovery cut off). Conveniently omitted from Ludowig's brief and Wagner's declaration is the remainder of the email exchange and any mention that, on April 1, 2025, the parties jointly agreed to conduct the deposition five weeks later on Thursday, May 8,

2025, as further reflected in the deposition notice served on April 2. Declaration of Michael Bernick at ¶¶ 3-4, Exhibits 1 and 2. During the ensuing month, Ludowig's counsel, Wagner, remained silent and at no time objected to the scheduled date. Therefore Ludowig's claim that "Empower knowingly scheduled the deposition on a date which Ludowig's counsel was unavailable" is demonstrably false. Ludowig Brief, pp. 10-11. It was BFS that noticed the deposition, and with the parties' combined input, noticed it for an agreed upon date. On Monday, May 5, three days before the scheduled deposition, Wagner announced that he would be unavailable, demanded that it be rescheduled, and proposed dates that were not workable. The deposition went forward as scheduled. It was ably conducted by LaPorte, who is both Ludowig's former attorney in this action and his former law partner. Wagner chose not to have a colleague from his firm participate (even remotely) in the deposition. Likewise, he chose not to re-schedule or have a colleague cover his other commitment.

Second, even if there had been a discovery violation, the requested draconian sanction is inappropriate. When a district court strikes a party's designation of expert witnesses and excludes their testimony as a sanction for violation of a discovery order, it examines four factors: (1) the importance of the witnesses' testimony; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to comply with the discovery order. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.,* 73 F.3d 546, 572 (5th Cir. 1996) (citations omitted). These factors weigh against Ludowig.

Here, LaMotta's testimony is crucial to Empower. There are no other damages experts who can cover his areas of proffered testimony. Ludowig will suffer no prejudice by allowing LaMotta to testify. LaMotta was already deposed by able co-defendants' counsel, and Ludowig has that

transcript. Indeed, he cited it extensively in his brief. Granting a continuance of the trial to allow Ludowig to re-depose LaMotta would prejudice Empower, both in terms of added expense and unnecessary delays. The trial is weeks away, witnesses' travel schedules are arranged, and trial preparation would be unfairly diverted by switching gears to conduct expert (re-)depositions at this late juncture. Finally, it is undisputed that Empower did not fail to comply with any discovery order; it made LaMotta available for a deposition in accordance with BFS's notice. Dkt. 78.[4]

Ludowig may well regret his decision not to obtain coverage from his colleagues, but he cannot exploit that decision to fabricate a discovery violation as a basis to exclude LaMotta's testimony.

**2.      _Syntel_ is Inapplicable and, If Anything, Supports Denial of Ludowig's Motion Because Defendants' Conduct Fits Within the Scenarios Deemed Appropriate for Avoided Costs**

Ludowig attacks LaMotta's use of "avoided costs" as a method of measuring unjust enrichment relying on out-of-circuit, readily distinguishable authority: _Syntel Sterling Best Shores Mauritius Ltd. v. The Trizetto Grp_, 68 F.4th 792, 812-14 (2d Cir. 2023). His reliance on _Syntel_ is misplaced. For starters, as noted in Section B1 above, the Fifth Circuit has expressly approved of avoided cost measurement of unjust enrichment. _See GlobeRanger Corp._ 836 F.3d at 499-500. In any event, _Syntel_ does not help Ludowig. Unlike here, _Syntel_ involved a defendant who made substantial profits from its trade secret misappropriation. Citing _GlobeRanger_ with approval, the Court noted that "[i]n some instances, unjust enrichment can include "avoided costs"—_i.e._, the costs a trade secret holder had to spend in research and development that a trade secret

---

[4] Ludowig's reliance on _Sierra Club_ is misplaced. That case involved a significant discovery violation that had far-reaching negative impacts on the opposing party. In _Sierra Club_, the expert disclosures consisted of a paltry, one paragraph statement of the experts' opinions, which the Court held failed to meet the standard of the required "complete and detailed" initial disclosures. Here, there was no discovery violation of any kind, let alone an egregious one. LaMotta sat for a multi-hour deposition pursuant to the notice of deposition.

misappropriator saves by avoiding development of its own trade secret." *Id.* at 809 (citations omitted). Acknowledging the "unusual" nature of the facts presented before it, the Court held that the defendant's $8.5 million of profits were a more appropriate measure of unjust enrichment than the defendant's avoided costs. The Court took care to clarify that avoided costs could be an appropriate measure of unjust enrichment in a "range of [other] factual scenarios concerning a defendant who has realized only modest profits from its misappropriation of trade secrets but has, nevertheless, been enriched by avoided costs in a larger amount at the expense of the secret holder." *Id.* at 812.

This case fits squarely in that range of scenarios. Here, unlike in *Syntel*, defendants realized no profits but their avoided costs exceeded $1 million. Moreover, the alleged trade secrets had significant value to defendants, as evidenced by their efforts to acquire and use them in developing their competing business. The fact that defendants' business ultimately failed does not negate the value they derived from misappropriating Empower's trade secrets and avoiding the costs of developing the information independently.

### 3. Ludowig's Various Attempts to Carve Himself Out From His Co-Defendants Do Not Work

Ludowig asserts various arguments to try to distance himself from his co-defendants and suggest that only they are potentially liable for any damages and unjust enrichment. None works. First, he takes issue with LaMotta's "reasonable royalty" calculation and insists that the "hypothetical negotiation" cannot apply to him because he is not BFS, he was "released" from liability, and he was not involved in the misappropriation at the time of the supposed "hypothetical negotiation." Ludowig Brief, p. 14. He cites no authority for support. Ludowig again ignores that liability is presumed in a damages calculation. Moreover, he cannot separate himself from BFS, as he played a key leadership role in BFS, as its President, CEO, and later General Counsel. Second

Amended Complaint Para. 50, 68. As for the timing of Ludowig's misconduct, Ludowig was involved in the misappropriation of trade secrets in as early as July 2023. Second Amended Complaint, Para. 32, 56. In any event, LaMotta's "hypothetical negotiation" accounted for the defendants' repeated instances of trade secret misappropriation; it was not based on a single isolated instance in July. LaMotta Report Para. 136. Finally, and again fatal to his argument, Ludowig is also alleged to have conspired with his co-defendants to misappropriate trade secrets. Second Amended Complaint Count XI.

Ludowig also argues that LaMotta's reasonable royalty analysis fails to account for Empower's alleged release of claims against Ludowig. But this argument goes to liability, which is presumed in damages analysis. It does not go to the admissibility of LaMotta's expert testimony. If Ludowig were ultimately deemed to be released from liability, that would affect the application of LaMotta's damages calculations to Ludowig, not the admissibility of LaMotta's testimony.

Second, Ludowig seems to argue that LaMotta was required to "apportion" a specific amount of damages caused only by Ludowig. Ludowig Brief, p. 10. This argument fares no better. As noted above, Ludowig was a key player in BFS, was involved in the trade secret misappropriation from early on, and in any event is also alleged to have conspired with his co-defendants. Second Amended Complaint Count XI: Civil Conspiracy Against All Defendants. His reliance on *Coe v. DNOW LP*, 718 S.W.3d 338 (Tex. App.—Hou. [14th Dist.] 2025) is misplaced. Ludowig misstates the holding of that case. For starters, in *Coe*, the Court reviewed the sufficiency of the evidence, meaning that the damages expert was permitted to testify. The Court did not hold that a damages expert in a trade secret misappropriation case must apportion damages to each individual defendant; rather, it faulted the damages expert for failing to distinguish between damages (measured by employee resignations) caused by misappropriation of the trade secrets as

opposed to misappropriation of confidential information or breach of fiduciary duty. *Id.* at 357-358. That has no application here.

Finally, in any event, Ludowig's challenges go to the weight, not admissibility, of LaMotta's testimony.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Ludowig's motion to preclude LaMotta's testimony and/or opinions.

Dated: November 13, 2025

ELLIS GEORGE LLP

*s/Mona Sedky*
Mona Sedky, *Pro Hac Vice*
California State Bar No. 170147
Christopher W. Arledge, *Pro Hac Vice*
California State Bar No. 200767
Courtney L. Mitchell, *Pro Hac Vice*
California State Bar No. 229598
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
Email: carledge@ellisgeorge.com
Email: msedky@ellisgeorge.com
Email: cmitchell@ellisgeorge.com

JACKSON WALKER L.L.P.
Michael H. Bernick
State Bar No. 24078227
S.D. Tex. ID 1439062
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4427
Email: mbernick@jw.com

Attorneys for Plaintiff
EMPOWER CLINIC SERVICES, L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2025, the foregoing **EMPOWER'S RESPONSE TO DEFENDANT LUDOWIG'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT RYAN LAMOTTA** has been served via CM/ECF, the Court's electronic case filing system, on all parties and counsel registered with CM/ECF in this action as follows:

| | |
|---|---|
| Anthony L. Laporte<br>Hanszen Laporte LLP<br>14201 Memorial Dr<br>Houston, TX 77079<br>Phone: 713-522-9444<br>Fax: 713-524-2580<br>Email: alaporte@hanszenlaporte.com | Attorneys for Defendants<br>BIO FILLING SOLUTIONS f/k/a BIO42<br>CLINICAL FILLING SOLUTIONS INC.;<br>DAVID TEER; LISA HUDANICH;<br>HANSON IRWIN GROUP LLC; MARC<br>HANSON and JERRY IRWIN |
| Aaron A. Wagner<br>Robert G. Wright<br>Kabat Chapman & Ozmer, LLP<br>171 17th Street NW, Suite 1550<br>Atlanta, GA 30363<br>Phone: 360-481-5107 (A. Wagner)<br>Phone: 404-400-7315 (R. Wright)<br>Email: awagner@kcozlaw.com<br>Email: rwright@kcozlaw.com | Attorneys for Defendant<br>MATTHEW LUDOWIG |

*s/Mona Sedky*
Mona Sedky